857 P.2d 1285

**George and Esperanza BATIZA, husband and wife, Plaintiffs/Garnishors/Appellees,**

v.

**Neil P. SUPERFON as Trustee of the NPS Defined Contribution Pension Plan, Defendant/Appellant,**

**and**

**Arizona Skin and Laser Surgery Profit Sharing Plan, Garnishee/Appellant.**

Nos. 2 CA–CV 92–0167, 2 CA–CV 92–0168.

Court of Appeals of Arizona, Division 2, Department B.

Nov. 24, 1992.

Review Denied Sept. 21, 1993.

Atmore Baggot and Gary A. Wieser, Phoenix, for plaintiffs/garnishors/appellees.

Brandes, Lane & Joffe, P.C. by Richard N. Brandes and Joseph M. Huey, Phoenix, for defendant/appellant and garnishee/appellant.

## OPINION

FERNANDEZ, Judge.

Appellees George and Esperanza Batiza filed suit against appellant Neil P. Superfon as trustee of the NPS Defined Contribution Pension Plan (Pension Plan) for failure to pay a promissory note. The trial court granted the Batizas' motion for summary judgment, and the trustee has appealed, arguing that disputed fact issues exist so as to preclude entry of summary judgment.

In attempting to collect their judgment, the Batizas discovered that the Pension Plan had been terminated and its assets transferred to Arizona Skin and Laser Surgery Profit Sharing Plan (Profit Sharing Plan). The Batizas garnished the new plan, contending that the transfer of assets was a fraudulent transfer. The trial court agreed and entered judgment against the Profit Sharing Plan. The Profit Sharing Plan has appealed from that judgment, arguing that the Employment Retirement Income Security Act of 1974 (ERISA), 29

U.S.C. §§ 1001 through 1461, preempts the Uniform Fraudulent Transfer Act, A.R.S. §§ 44–1001 through 44–1010. It also argues that if the garnishment proceeding is not preempted, the transfer of assets did not constitute a violation of the Fraudulent Transfer Act. The two appeals have been consolidated. We find no error and affirm.

In October 1986, the Batizas agreed to sell a residential lot in Phoenix for $185,000. On December 4, 1986, the trustee of the Pension Plan assumed the nominee position on the contract and executed a note for $180,000, which was secured by a deed of trust. Escrow closed December 23, and the Batizas were paid $5,000 cash for the sale. In March 1987, the Pension Plan sold the property to LaJolla Properties, Inc. Although that sale price is not mentioned in the record, the parties agreed at oral argument that the trustee sold the property to LaJolla for $250,000. At the time that sale closed, the Batizas were paid $10,000. In connection with the sale, both the Pension Plan and the Batizas agreed to subordinate their interests to a construction loan on the property.

Although quarterly payments were required under the note, only one was ever paid. The note came due in December 1988. The Batizas apparently lost their security interest in the property when the construction lender foreclosed on its lien. The Batizas then sued on the note in August 1989. The trial court subsequently granted their motion for summary judgment.

### SUMMARY JUDGMENT

■ The trustee argues that the court erred in granting summary judgment, contending that the court mischaracterized the issue and that disputed facts and disputed inferences from undisputed facts precluded summary judgment. Specifically, the trustee argues that there is a factual dispute as to whether the note was cancelled by the $10,000 payment to the Batizas when the trustee sold the property to LaJolla.

The note contains a due-on-sale clause. The evidence was that both parties were represented by agents at the time the trustee sold the lot to LaJolla and that the Batizas and the trustee never spoke directly to each other. The Batizas' agent stated in her affidavit that she had originally attempted to have the note paid in full at the time the trustee sold to LaJolla, that she was aware the first quarterly payment would soon be due, and that the Batizas had agreed to subordinate their interest to a construction loan. She also stated that there was no discussion about releasing the Pension Plan from the note and that her intention in agreeing to accept the $10,000 was to waive the due-on-sale clause.

In its minute entry, the court stated that the dispute "centered on whether the $10,000 payment was for waiver of the due on sale clause or for cancellation of the note." The court concluded that the payment was for waiver of the clause.

In support of his contention that the court mischaracterized the issue, the trustee points to the following testimony by George Batiza, arguing that he never stated the payment was for waiver of the due-on-sale clause:

Q. Now, am I correct that the 10,000 dollar payment was a payment you asked for or negotiated for as a condition of agreeing to the sale from Superfon to La Jolla?

A. Yes.

\*  \*  \*  \*  \*  \*

Q. Okay. What were you—why were you asking for 10,000 dollars?

A. I don't know that I had a particular reason.

Q. It wasn't due and owing to you, correct?

A. No it was not.

Q. There was some basis for it, was there not?

A. I'm sure I had a reason, but I don't remember of any particular reason. Good faith money if you want to call it.

In so arguing, the trustee completely ignores Batiza's additional testimony.

**434**

Q. In fact, under your original agreement with Doctor Superfon as trustee, he was required, was he not, to pay the balance of anything due at the time he sold that property; isn't that correct?

A. Yes.

Q. He was not doing that, correct?

A. Yes.

Q. You didn't require him to do that, correct?

A. That is correct.

Q. But you agreed to change that by accepting 10,000 dollars, correct?

A. Yes.

Based on that testimony, we are unable to see how the trial court mischaracterized the issue before it.

Neither the trustee nor his agent submitted an affidavit in opposition to the summary judgment motion. The trustee relied solely on Batiza's statements at his deposition. In his answer, the trustee admitted that he signed the note. Under Arizona law, the Batizas are thus entitled to recover unless the trustee established a defense to the note. A.R.S. § 47–3307(B); *Glubauer v. Smith*, 10 Ariz.App. 328, 458 P.2d 532 (1969). The trustee did not present any evidence that he and Batiza had agreed to cancel the note nor did he show that the Batizas discharged the Pension Plan in accordance with A.R.S. § 47–3605 (instrument holder can discharge party either by renouncing rights in writing or by cancelling the instrument on its face).

Under the standards established by our supreme court in *Orme School v. Reeves*, 166 Ariz. 301, 802 P.2d 1000 (1990), if discovery is complete, a trial court should grant summary judgment if the evidence is such as to require it to grant a motion for directed verdict at trial. Under the circumstances, therefore, we agree with the trial court that there are no material fact issues and that summary judgment was appropriate.

## ERISA PREEMPTION

█ After judgment was entered, the Batizas discovered that the NPS Pension Plan had conveyed all its assets to the Profit Sharing Plan. They then filed an application for a writ of garnishment against the Profit Sharing Plan. In its answer, the Profit Sharing Plan stated that it held no property of the Pension Plan. The Batizas objected, contending that the Pension Plan had fraudulently conveyed its property to the Profit Sharing Plan in violation of the Uniform Fraudulent Transfer Act.

The Pension Plan was established in 1983 as a qualified ERISA plan for the benefit of the employees of Arizona Dermatology, Ltd. As a result of funding limit changes for qualified plans that were contained in the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2085 (codified in scattered sections of 26 U.S.C), the two directors voted to terminate the Pension Plan as of December 31, 1986. The directors voted on December 23, 1986, the same day escrow closed on the sale of the Batizas' lot to the trustee. No changes were made in the Pension Plan, however, until the Internal Revenue Service issued a ruling nearly three years later that required terminated plans to distribute all plan assets by December 31, 1989, or lose their favorable tax treatment. Rev.Rul. 89–87, 1989–27 I.R.B. 5. The Pension Plan then transferred assets in excess of $2.5 million to the newly established Profit Sharing Plan.

The trustee argues that this suit is preempted by § 514(a) of ERISA, 29 U.S.C. § 1144(a), which reads as follows: "Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan...."

As the United States Supreme Court has held, "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines*, 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490, 501 (1983). The preemption section has been broadly interpreted, *Miller v. Aetna Life & Casualty Insurance Co.*, 162 Ariz. 588, 785 P.2d 108 (App.1989),

but there are actions to which it does not apply. *Hospice of Metro Denver, Inc. v. Group Health Insurance of Oklahoma, Inc.*, 944 F.2d 752 (10th Cir.1991) (promissory estoppel claim by health care provider against ERISA plan not preempted); *Retirement Fund Trust of Plumbing v. Franchise Tax Board*, 909 F.2d 1266 (9th Cir.1990) (state tax withholding of plan benefits not preempted); *Martori Bros. Distributors v. James–Massengale*, 781 F.2d 1349, *amended on other grounds*, 791 F.2d 799 (9th Cir.), *cert. denied*, 479 U.S. 949, 107 S.Ct. 435, 93 L.Ed.2d 385, 479 U.S. 1018, 107 S.Ct. 670, 93 L.Ed.2d 722 (1986), *overruled on other grounds, Fresh International Corp. v. Agricultural Labor Relations Board*, 805 F.2d 1353 (9th Cir.1986) (California statutory make-whole award of fringe benefits as a result of unfair labor practices not preempted).

In *Mackey v. Lanier Collection Agency & Service*, 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988), the United States Supreme Court held that the vacation benefits of participants in an ERISA employee welfare benefit plan could be garnished by a collection agency and that Georgia's statute prohibiting such garnishment was preempted by ERISA. The Court gave two reasons for its conclusion.

The first is that ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1), contains a "sue and be sued" provision and thus "contemplates execution of judgments won against plans in civil actions." *Mackey*, 486 U.S. at 833, 108 S.Ct. at 2187, 100 L.Ed.2d at 846. Despite that contemplation, however, the Court noted that ERISA does not provide any mechanism for collecting unpaid judgments. "Consequently, state-law methods for collecting money judgments must, as a general matter, remain undisturbed by ERISA; otherwise, there would be no way to enforce such a judgment won against an ERISA plan." *Id.* at 834, 108 S.Ct. at 2187–88, 100 L.Ed.2d at 846. That reasoning is certainly pertinent to the Batizas' attempt in this case to enforce the judgment they were awarded.

The second basis for the ruling in *Mackey* is that welfare plan benefits were not made inalienable under ERISA. That reason is not applicable in this case because the plan at issue is a pension plan. Under ERISA, pension plan *benefits* cannot be alienated or assigned. ERISA § 206(d)(1), 29 U.S.C. § 1056(d)(1). That section "prohibits the use of state enforcement mechanisms only insofar as they prevent those benefits from being paid to plan participants." *Mackey*, 486 U.S. at 836, 108 S.Ct. at 2189, 100 L.Ed.2d at 848. It is important to note that the garnishment proceeding here seeks assets of the plan in general; there is no attempt to garnish any benefits currently being received by any plan participant.

In *Mackey*, the Supreme Court noted that "lawsuits against ERISA plans for run-of-the-mill state-law claims such as unpaid rent, failure to pay creditors, or even torts committed by an ERISA Plan—are relatively commonplace.... [T]hese suits ... are not pre-empted by ERISA § 514(a)." 486 U.S. at 833, 108 S.Ct. at 2187, 100 L.Ed.2d at 846. In *FMC Corporation v. Holliday*, 498 U.S. 52, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990), the Court ruled that a Pennsylvania statute was preempted by ERISA. The statute precluded subrogation by a health care plan of settlement proceeds in a tort action. In its discussion, the Court observed that its ruling was "respectful of the presumption that Congress does not intend to pre-empt areas of traditional state regulation," *id.* at 62, 111 S.Ct. at 410, 112 L.Ed.2d at 367, noting that it has found state laws preempted when they "risk subjecting plan administrators to conflicting state regulations." *Id.* at 59, 111 S.Ct. at 408, 112 L.Ed.2d at 365.

In *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), the Court rejected the appellant's argument that ERISA preempts any state law pertaining to employee benefits, emphasizing the fact that the preemption provision applies to laws relating to employee benefit *plans*. The Court explained the legislative intent of the provision as follows: "Congress intended pre-emption to afford employers the advantages of a uniform set of administrative procedures gov-

erned by a single set of regulations." *Id.* at 11, 107 S.Ct. at 2217, 96 L.Ed.2d at 11. The Court there found that a Maine statute requiring a one-time severance payment to employees affected by a plant closing was not preempted by ERISA, noting that the statute neither established nor required the employer to maintain an employee benefit plan, required no administrative scheme for compliance, and required the plan administrator to write only a single set of checks to the employees involved. Those factors exist in this case as well; in fact, the administrator here need write only a single check to satisfy the judgment. We can see no risk of subjecting plan administrators to conflicting state regulations by permitting garnishment of a pension plan to pay an uncollected judgment under the facts in this case.

■ It is thus obvious that Congress intended the preemption clause to apply when state laws, rules, and regulations affect the internal administration of ERISA plans. This case does not involve the internal administration of the Profit Sharing Plan. The Plan contends, however, that the preemption provision precludes the application of the Uniform Fraudulent Transfer Act to reach its assets after they were conveyed by the Pension Plan, another qualified ERISA plan. The authorities it cites, however, do not support its contention.

In *Christ Hospital v. Greenwald*, 82 Ill. App.3d 1024, 38 Ill.Dec. 469, 403 N.E.2d 700 (1980), the court held that ERISA preempted the garnishment of an individual's retirement benefits to pay an uncollected judgment. That ruling was required, of course, by the express ERISA provision that prohibits the alienation of pension plan benefits. 29 U.S.C. § 1056(d)(1). That was also the case in *Commercial Mortgage Insurance v. Citizens National Bank of Dallas*, 526 F.Supp. 510 (N.D.Tex.1981). As we noted earlier, however, the garnishment sought here is of assets of the plan itself, not of any participant's currently paid benefits.

The statute held to be preempted in the Plan's final case, *Hewlett–Packard Co. v. Barnes*, 425 F.Supp. 1294 (N.D.Cal.1977), *aff'd*, 571 F.2d 502 (9th Cir.), *cert. denied*, 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978), was a comprehensive act intended specifically to govern the delivery of health care services to California residents who participated in health care service plans. An act such as that could do nothing but interfere with the internal administration of ERISA plans. That act, however, bears no resemblance to the Uniform Fraudulent Transfer Act at issue here.

■ The Profit Sharing Plan has not cited any case in which the type of garnishment sought here has been held to be preempted by ERISA, and we can find no legislative purpose to be served by holding that it is preempted. *Fort Halifax Packing Co., supra.* Nor do we find merit to the Plan's argument that the Pension Plan was "required" to transfer its assets to the Profit Sharing Plan under ERISA. As the trial court correctly observed, "Congress did not require a transfer of plan assets; rather, a transfer was desirable for participants in the first plan to avoid tax consequences from distribution of the plan assets as the first plan was 'frozen'. Here, the participants decided to merge the first plan into a second plan as allowed by law." We agree with the trial court that the Batizas' garnishment proceedings are not preempted by ERISA.

## VIOLATION OF FRAUDULENT TRANSFER ACT

■ The Profit Sharing Plan also contends that the Batizas failed to show a violation of the Fraudulent Transfer Act, arguing that there was no intent to defraud because the assets were transferred solely to comply with federal law. As the Plan notes, A.R.S. § 44–1004(A)(1) requires that the transfer be made "[w]ith actual intent to hinder, delay or defraud any creditor of the debtor." We disagree, however, with the Plan's contention that there was no evidence of an intent to defraud. The Batizas obtained a valuation report of the properties held by the Pension Plan as of July 31, 1987, apparently the most recent report

available. The report listed assets totalling $2,527,773.67 and liabilities totalling $340,-498.96. The note payable to the Batizas was not included in the list of liabilities.

In its answers to interrogatories, the Profit Sharing Plan stated that no assets remained in the Pension Plan after the transfer. There is no explanation of what became of the Batizas' note. Moreover, the transfer of assets, minus this liability, occurred after the Batizas had both sent a demand letter and filed suit. With regard to the issue of fraudulent intent, the trial court found as follows:

> [T]he Court is somewhat puzzled why, if assets were merged or transferred into the second plan, one asset, the promissory note, was left behind. The Defendants have offered no explanation from the pension plan attorneys as to this fact. On the facts before the Court, the only reasonable inference that can be drawn is that Defendants were attempting to avoid payment of the debt created by the promissory note.

Although we are unclear why the trial court characterized the note as an asset rather than the liability it actually was, we find the evidence sufficient to support its finding of intent to defraud. That finding is sufficient to establish a violation of the Fraudulent Transfer Act. We find no error.

Affirmed.

HATHAWAY and ESPINOSA, JJ., concur.